**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| PATRICIA CAVALLARO-KEARINS, individually and on behalf of all others similarly situated,<br><br>*Plaintiff,*<br><br>v.<br><br>DELTA DENTAL OF NEW YORK, INC.,<br><br>*Defendant.* | Case No. 7:24-cv-06946-CS<br><br>JURY TRIAL DEMANDED |

**SECOND AMENDED CLASS ACTION COMPLAINT**

Plaintiff Patricia Cavallaro-Kearins brings this class action lawsuit in her individual capacity and on behalf of all others similarly situated against Delta Dental of New York, Inc. ("Delta Dental" or "Defendant") and alleges, upon personal knowledge as to her own actions and experiences, her counsel's investigation and upon information and belief as to all other matters, as follows.

**INTRODUCTION**

1. This case concerns a breach of Delta Dental's data privacy and security obligations as it installed certain tracking technologies on its digital property to collect and to disclose to unauthorized third parties Plaintiff's and Class Members' personally identifiable information ("PII") and non-public personal health information ("PHI" and with PII, "Private Information") for its own pecuniary gain.

2. Specifically, in order to gain additional insights into its plan members, improve its return on its marketing spend and, ultimately, to increase its revenue, Delta Dental encouraged Plaintiff and Class Members to access and to use various digital tools via its website

https://www1.deltadentalins.com/ (the "Website") in order to, among other things, find dentists within their particular insurance plan that were located near Plaintiff and Class Members.

3. Plaintiff and Class Members who visited and used Defendant's Website understandably thought they were communicating *only* with their trusted health plan.

4. Unbeknownst to Plaintiff and Class Members, however, Defendant embeds several tracking technologies—including those offered by Adobe, Google, Datadog, and Qualtrics—on its Website that automatically transmit to each service technology provider confidential details about Delta Dental's plan members.

5. Operating as designed and as implemented by Defendant, the tracking technologies at issue in this case allowed the Private Information that Plaintiff and Class Members provided to Defendant to be unlawfully disclosed to Adobe, Google, Datadog, and Qualtrics alongside unique and persistent identifiers that identify the plan member in a manner that violates federal law.

6. By installing the tracking technologies, Defendant effectively planted a bug on Plaintiff's and Class Members' web browsers and compelled them to unknowingly disclose their private, sensitive and confidential health-related data and communications with Defendant to Adobe, Google, Datadog, and Qualtrics. Those communications include plan member requests that identify (a) the Delta Dental plan member as a Delta Dental plan member, (b) the type of health plan in which they were members, (c) that they were seeking treatment for oral healthcare from dentists located near their address or zip code, (d) the type of dentist they were considering, (e) keywords that they typed in to specifically query Delta Dental about, and (f) details about that dentist that the plan member told Delta Dental were important to them (*e.g.*, gender, language spoken, board-certification).

7. This type of Private Information is, in turn, simultaneously intercepted by Adobe, Google, Datadog, and Qualtrics that use it to create fulsome and robust profiles for the purposes

of retargeting and future marketing, among other business purposes that benefit the third-party service providers.

8. Plan members simply do not anticipate that their trusted health plan sends personal health information or confidential medical information collected via its Website to any undisclosed third party – let alone technology providers, such as Google, which has a sordid history of privacy violations in pursuit of ever-increasing advertising revenue – without the plan members' informed and express consent.

9. Neither Plaintiff nor any other Class Member were provided, much less signed, a written authorization permitting Defendant to disclose their Private Information to Adobe, Google, Datadog, and Qualtrics or any third-party service provider.

10. Despite willfully and intentionally incorporating the tracking technologies into its Website and servers, Defendant has never disclosed to Plaintiff or Class Members that it shared their sensitive and confidential communications and Private Information with Adobe, Google, Datadog, and Qualtrics.[1]

11. Plaintiff and Class Members were unaware that their Private Information was being surreptitiously transmitted to Adobe, Google, Datadog, and Qualtrics as they communicated with Defendant via its Website so it could be used for targeted advertising and marketing purposes.

[1] In contrast to Defendant, several medical providers which have installed similar tracking technologies on their web properties have provided their plan members with notices of data breaches caused by the technology transmitting PHI to third parties. *See*, *e.g.*, *Cerebral, Inc. Notice of HIPAA Privacy Breach*, available at https://cerebral.com/static/hippa_privacy_breach-4000c6eb21449c2ecd8bd13706750cc2.pdf (last visited Aug. 28, 2024); *Advocate Aurora says 3M plan members' health data possibly exposed through tracking technologies* (Oct. 20, 2022), available at https://www.fiercehealthcare.com/health-tech/advocate-aurora-health-data-breach-revealed-pixels-protected-health-information-3 (last visited Aug. 28, 2024); *Novant Health notifies plan members of potential data privacy incident* (Aug. 19, 2022), available at https://www.prnewswire.com/news-releases/novant-health-notifies-patients-of-potential-data-privacy-incident-301609387.html (last visited Aug. 28, 2024).

12. The disclosure of Plaintiff's and Class Members' Private Information via tracking technologies contravenes the letter and spirit of the Health Insurance Portability and Accountability Act of 1996 ("HIPAA"). As part of HIPAA, the United States Department of Health and Human Services ("HHS") established "Standards for Privacy of Individually Identifiable Health Information" (also known as the "Privacy Rule") which governs how covered entities, such as health plans, must safeguard and protect Private Information.

13. Simply put, further to the HIPAA Privacy Rule, covered entities such as Defendant are ***not*** permitted to use tracking technology tools in a way that exposes plan members' Private Information to any third-party without express and informed consent from each patient.

14. Lest there be any doubt of the illegal nature of Defendant's practice, the Office for Civil Rights (OCR) at HHS has made clear, in a recent bulletin entitled *Use of Online Tracking Technologies by HIPAA Covered Entities and Business Associates*, that the unlawful transmission of such protected information violates HIPAA's Privacy Rule:

> Regulated entities [those to which HIPAA applies] are not permitted to use tracking technologies in a manner that would result in impermissible disclosures of PHI to tracking technology vendors or any other violations of the HIPAA Rules. ***For example, disclosures of PHI to tracking technology vendors for marketing purposes, without individuals' HIPAA-compliant authorizations, would constitute impermissible disclosures.***[2]

15. Similarly, the FTC addressed also addressed these privacy concerns:

> In today's surveillance economy, the consumer is often the product. Consumer data powers the advertising machine that goes right back to the consumer. ***But when companies use consumers' sensitive health data for marketing and advertising purposes, such as by sending that data to marketing firms via tracking pixels on websites or software development kits on apps, watch out***.[3]

---

[2] *See Use of Online Tracking Technologies by HIPAA Covered Entities and Business Associates,* available at https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/hipaa-online-tracking/index.html (last visited Aug. 28, 2024) (emphasis added).

[3] Elisa Jillison, *Protecting the privacy of health information: A Baker's dozen takeaways from FTC cases*, the FTC Business Blog (July 25, 2023) (emphasis added))

16. Defendant further made express and implied promises to protect Plaintiff's and Class Members' Private Information and maintain the privacy and confidentiality of communications that plan members exchanged with Defendant. Furthermore, by obtaining, collecting, using and deriving a benefit from Plaintiff's and Class Members' Private Information, Defendant assumed legal and equitable duties to those individuals to protect and to safeguard that information from unauthorized disclosure.

17. Defendant has not disclosed to Plaintiff or Class Members that it shares plan members' sensitive and confidential communications with Adobe, Google, Datadog, and Qualtrics.

18. As a result, Plaintiff and Class Members were unaware that their PII and PHI were being surreptitiously transmitted to Adobe, Google, Datadog, and Qualtrics as they communicated with their health plan.

19. Delta Dental breached its obligations in one or more of the following ways: (i) failing to adequately review its marketing programs and web based technology to ensure the Website was safe and secure; (ii) failing to remove or disengage technology that was known and designed to share web users' information; (iii) failing to obtain the consent of Plaintiff and Class Members to disclose their PII and PHI to Adobe, Google, Datadog, and Qualtrics or others; (iv) failing to take steps to block the transmission of Plaintiff's and Class Members' PII and PHI through the tracking technologies; (v) failing to warn Plaintiff and Class Members; and (vi) otherwise failing to design and monitor its Website to maintain the confidentiality and integrity of patient PII and PHI.

20. Plaintiff and Class Members have suffered injury as a result of Defendant's conduct; these injuries include: (i) invasion of privacy; (ii) loss of benefit of the bargain, (iii) compromise and disclosure of Private Information and identities, (iv) loss of value of their Private

Information, (iv) violations of statutory rights and related statutory damages, and (v) the continued and ongoing risk to their Private Information.[4]

21. Plaintiff seeks to remedy these harms and therefore assert causes of action for (i) Breach of Contract; (ii) Breach of Fiduciary Duty; (iii) Unjust Enrichment; (iv) Breach of Implied Contract; (v) Breach of Confidence; (vi) bailment; (vii) Violation of New York's Deceptive Trade Practices Act (New York Gen. Bus. Law § 349); and (viii) Violation of the Wiretap Act (18 U.S.C. § 2510, *et seq.*).

**PARTIES**

22. Delta Dental of New York, Inc. is a non-profit entity with its principal place of business at One Delta Drive, Mechanicsburg, PA 17055.

23. Plaintiff Patricia Cavallaro-Kearins is a natural person and a citizen of the State of New York. Plaintiff logged into her Delta Dental portal on the Delta Dental Website and was authenticated as a plan member from her mobile devices and/or computers and thereafter used the Website to look for dentists located near her by in putting location information and her plan type. Further to the systematic process described herein, Defendant assisted Adobe, Google, Datadog, and Qualtrics with intercepting Plaintiff's communications, including those that contained personally identifiable information, protected health information and related confidential information. Defendant assisted these interceptions without Plaintiff's knowledge, consent or express written authorization.

**JURISDICTION & VENUE**

24. This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1331 because it arises under the laws of the United States, and under 28 U.S.C. § 1332(d) because this

---

[4] The exposed Private Information of Plaintiff and Class Members can—and likely will—be further disseminated to additional third parties utilizing the data for retargeting.

is a class action wherein the amount in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, there are more than 100 members in the proposed class, and at least one member of the class is a citizen of a state different from Defendant.

25. This Court has personal jurisdiction over Defendant because a substantial portion of the acts and omissions giving rise to Plaintiff's claims occurred in and emanated from this District.

26. Venue is proper under 18 U.S.C § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claim occurred in this District.

## COMMON FACTUAL ALLEGATIONS

### A. *Defendant Improperly Disclosed Plaintiff's & Class Members' Private Information.*

27. Delta Dental offers dental health insurance to New York residents.

28. Defendant's Website, https://www1.deltadentalins.com/, is accessible on mobile devices and desktop computers.

29. Defendant utilized tracking technologies that it installed on its Website.

30. Through seeking and using Defendant's services, and utilizing the Website services, Plaintiff's and Class Members' Private Information was intercepted in real time and then disseminated to Adobe, Google, Datadog, and Qualtrics (herein, "Tracking Technology Vendors"), and to other third parties,[5] via the tracking technologies that Defendant surreptitiously installed on its Website.

31. Plaintiff and Class Members did not intend or have any reason to suspect their Private Information would be shared with the Tracking Technology Vendors or that Defendant

[5] Plaintiff's investigation demonstrates that similar information is also disclosed to other third-party technology vendors.

was tracking the dentists they were seeking within their insurance plan on their Website and disclosing the same and other confidential details to the Tracking Technology Vendors.

32. Defendant did not disclose to or warn Plaintiff or Class Members that Defendant used the Private Information contained in Plaintiff's and Class Members' Website requests for marketing purposes.

33. Plaintiff and Class Members never consented, agreed, authorized, or otherwise permitted Defendant to disclose their Private Information.

34. Upon information and belief, Defendant assisted the interception of and disclosed the following non-public private information to the Tracking Technology Vendors:

a. Plaintiff's and Class Members' status as plan members;

b. Plaintiff's and Class Members' communications with Defendant through its Website;

c. Plaintiff's and Class Members' need for dental services, the type of dentist (*e.g.*, general or a specialist), the insurance plan type, and the location of the patient (among other confidential details about their healthcare provider);

d. Personally identifiable information including but not limited to plan members' locations, an IP address, device identifier and/or an individual's unique and persistent identifier, including those associated with Google.

35. Defendant deprived Plaintiff and Class Members of their privacy rights when it: (i) implemented technology that surreptitiously tracked, recorded, and disclosed Plaintiff's and other online plan members' confidential communications and Private Information; (ii) disclosed plan members' protected information to the Tracking Technology Vendors—unauthorized third-parties; and (iii) undertook this pattern of conduct without notifying Plaintiff or Class Members and without obtaining their express written consent.

**B. *Background on Web Browsers, Source Code, & Tracking Technologies.***

36. Web browsers are software applications that allow consumers to exchange electronic communications over the Internet.

37. Every website is hosted by a computer server through which the entity in charge of the website exchanges communications with Internet users via their web browsers.

38. The set of instructions that commands the browser is called the source code.

39. Source code may also command a web browser to send data transmissions to third parties via technologies that effectively open a spying window through which a website funnels data about users and their actions to third parties.

40. Tracking technologies are installed by web developers on pages of the websites they host that are run on the host's servers.

41. The third parties to whom the website transmits data through scripts do not provide any substantive content relating to the user's communications. Instead, these third party tracking technologies are typically configured to track user data and communications for marketing purposes.

42. Thus, without any knowledge, authorization, or action by a user, a website developer like Defendant can use its source code to commandeer the user's computing device, causing the device to contemporaneously and invisibly re-direct the users' personally identifiable non-public medical information and communications to third parties.

43. When a user accesses a website hosting a tracking tool, the tracking tool software scripts surreptitiously direct the user's browser to send a separate message to the third-party technology provider.

44. This second, secret transmission contains the original requests exchanged with the host website (called a "GET request" and a "POST request"), along with additional data that the tracking technology is configured to collect.

45. The original GET and POST requests include the webpage's Universal Resource Locator ("URL") and metadata, including IP address.

46. This transmission is initiated by a tracking tool's code and concurrent with the communications with the host website. Two sets of code are thus automatically run as part of the browser's attempt to load and read the host website—the host's own code, and a tracking tool's embedded code.

47. Once the third-party technology vendor collects the information contained in the original GET and POST requests sent to the host website, the third-party can store and use the information for various business purposes of their own, including targeted advertising.

**C. *How Delta Dental Discloses Class Members' Protected Health Information and Assists with Intercepting Communications.***

48. Defendant installed tracking technologies offered by Google, Adobe, Datadog, and Qualtrics on its Website for marketing purposes.

49. Google and Adobe are household names.

50. Datadog is a monitoring and analytics platform that, among other things, monitors users' interactions with websites and provides analysis and visualization tools to its clients.

51. Qualtrics is an online platform designed for experience management, primarily focused on gathering and analyzing data related to customer experiences.

52. Plaintiff will illustrate how the tracking technologies operate on Defendant's Website with reference to Google's tracking technologies.

53. Defendant installed on its Website JavaScript associated with Google Ads, Google Doubleclick Ads, and Google Analytics (herein, "Google Tracking Technologies").

54. Once a plan member logs in, they are given the option to "find a dentist."

55. The plan member is prompted to input her address, city, or zip code and any additional keywords, and then to ask Defendant to "search" for a dentist that fits the parameters of the plan member's request.

56. When the plan member inputs her personal information and communicates with Defendant that the plan member wants to find a dentist, Defendant returns the results of the query with information about general dentists within the members' plan located near the member.

57. Here is an example of what the plan member might see.



58. Because Defendant deployed Google Tracking Technologies on its Website, the Google Tracking Technologies software scripts surreptitiously directed the plan member's browser to send a separate message to Google that contained the plan member's communication with Defendant—that the plan member asked Defendant to help her "find a dentist," her address, city, or zip code, and her type of insurance network (*e.g.*, ppo). Google also received the user's IP address; the type of browser and the type of operating system (called user-agent data); and the time it was sent (called a timestamp).

59. As the plan member refines her search parameters, each request to Defendant to refine the search parameters is also communicated to Google.

60. For instance, the plan member could filter her search by whether the dentist is accepting new patients, their provider specialty (e.g., pediatrics), the type of specialized care offered (e.g., treats children), languages spoken, extended office hours, office access, board-certification, and the gender of the dentist. Each of these search parameters that the plan member communicates to Defendant is *also* communicated to Google.

61. If a plan member communicates to Delta Dental keywords that are important to her search, such as "crown," the exact keywords that the plan member communicated to Delta Dental are also communicated to Google.

62. Each of these communications is accompanied by the plan member's: IP address; device identifiers; URLs; and other unique identifying numbers, characteristics, or codes (*i.e.*, metadata).

63. Each of these communications, along with the metadata that identifies the plan member, is also sent to Data Dog and Qualtrics.

64. By virtue of the Google Analytics Tracking Technology, the plan member's browser also shares with Defendant and Google two cookies: the _ga and _Secure-3P session

cookies. These cookies contain a Google Client ID. Google Analytics uses this Client ID to connect hits from the same plan member into sessions and to track plan member behavior across multiple visits to Defendant's and other websites.

65. The other tracking technologies for Data Dog and Qualtrics work in substantially similar manners (with the exception that the other tracking technologies do not disclose the Google Client ID) (the tracking technologies offered by Google, Adobe, Data Dog, and Qualtrics, are collectively called the "Tracking Technologies").

66. Moreover, when a plan member logs into her account prior to searching for a dentist, as Plaintiff did, the Tracking Technology Vendors each learn that the plan member has logged in and, hence, is an authenticated plan member.

67. Google, Adobe, Data Dog, and Qualtrics will receive the same information as described above.

68. This is precisely the type of information that HIPAA requires healthcare providers to de-anonymize to protect the privacy of plan members.[6]

69. Plaintiff's and Class Members' identities could be easily determined based on the Google session ID, IP address and/or from the collection of other identifying information that was improperly disclosed.

70. After intercepting and collecting this information, the Tracking Technology Vendors process it, analyze it, and assimilate it into datasets and use it for their own benefit, including to target the plan member with targeted advertising.

[6] *See* https://www.hhs.gov/hipaa/for-professionals/privacy/special-topics/de-identification/index.html (last visited Aug. 28, 2024).

71. In other words, the Tracking Technologies allow the Tracking Technology Vendors to know the content of Defendant's plan members' communications with Defendant through Defendant's Website that relates to the plan members' medical care.

72. Notably, this transmission only occurs on webpages that contain the Tracking Technologies. Thus, Plaintiff's and Class Members' Private Information would not have been disclosed to the Tracking Technology Vendors but for Defendant's decisions to install the Tracking Technologies on its Website.

73. By installing and implementing the Tracking Technologies, Defendant caused Plaintiff's and Class Members' communications to be intercepted and transmitted to Google, Adobe, Datadog, and Qualtrics via their Tracking Technologies.

74. Defendant's knowledge is further demonstrated by the fact that Defendant has installed the Facebook Tracking Pixel on its Website, *but* it has truncated and otherwise removed descriptive information from the pages associated with finding a dentist so that the medical information is obscured when it is communicated to Facebook via the Facebook Tracking Pixel. In contrast, Defendant did *not* truncate and otherwise remove descriptive information from the pages associated with finding a dentist so that the medical information is obscured when it is communicated to the Tracking Technology Vendors.

75. Through the Tracking Technologies, Defendant shares its plan members' identities and information related to their private medical treatment.

76. Plaintiff never consented, agreed, authorized, or otherwise permitted Defendant to disclose their personally identifiable information and protected health information; nor did they authorize any assistance with intercepting their communications. Plaintiff were never provided with any written notice that Defendant disclosed its plan members' protected health information,

nor were they provided any means of opting out of such disclosures. Despite this, Defendant knowingly disclosed Plaintiff's protected health information to the Tracking Technology Vendors.

77. By law, Plaintiff are entitled to privacy in their protected health information and confidential communications. Defendant deprived Plaintiff and Class Members of their privacy rights when it: (i) implemented a system that surreptitiously tracked, recorded, and disclosed Plaintiff's and Class Members' confidential communications, personally identifiable information, and protected health information to a third party; (ii) disclosed plan members' protected information to the Tracking Technology Vendors – unauthorized third-party eavesdroppers; and (iii) undertook this pattern of conduct without notifying Plaintiff and Class Members and without obtaining their express written consent.

78. Plaintiff did not discover that Defendant disclosed their personally identifiable information and protected health information to the Tracking Technology Vendors, and assisted those Providers with intercepting their communications, until approximately shortly before the Complaint was filed.

**D. *Defendant's HIPAA Notice of Privacy Practices & Promises.***

79. Defendant publishes a HIPAA Notice of Privacy Practices. Defendant acknowledges that Defendant is "required by law to maintain the privacy and security of your" PHI. Defendant states it may "use[] and disclos[e ] your PHI for treatment, payment or health care operations," but not marketing purposes. Indeed, Defendant agrees it "will obtain your authorization for the use or disclosure of PHI for marketing when required by law."

80. Defendant's HIPAA Notice of Privacy Practices does ***not*** permit Defendant to use and disclose Plaintiff's and Class Members' Private Information for marketing purposes.

81. Defendant's assurances that it will keep plan members' Private Information confidential and secure, are false.

82. Defendant conceals its use of Tracking Technologies to track plan members' personally identifiable information, even when it discusses its use of internet analytical tools.

83. Defendant violated its own HIPAA Notice of Privacy Practices by unlawfully intercepting and disclosing Plaintiff's and Class Members' Private Information to the Tracking Technology Vendors without adequately disclosing that Defendant shared Private Information with third parties and without acquiring the specific plan members' consent or authorization to share the Private Information.

**E. *Defendant Violated HIPAA.***

84. Plan member health care information in the United States is protected by federal law under HIPAA and its implementing regulations, which are promulgated by the HHS.

85. The HIPAA Privacy Rule, located at 45 CFR Part 160 and Subparts A and E of Part 164, "establishes national standards to protect individuals' medical records and other individually identifiable health information (collectively defined as 'protected health information') and applies to health plans, health care clearinghouses, and those health care providers that conduct certain health care transactions electronically."[7]

86. The Privacy Rule broadly defines "protected health information" ("PHI") as "individually identifiable health information" ("IIHI") that is "transmitted by electronic media; maintained in electronic media; or transmitted or maintained in any other form or medium." 45 C.F.R. § 160.103.

87. IIHI is defined as "a subset of health information, including demographic information collected from an individual" that is: (1) "created or received by a health care provider, health plan, employer, or health care clearinghouse"; (2) "[r]elates to the past, present, or future

[7] HHS.gov, Health Information Privacy (Mar. 31, 2022), https://www.hhs.gov/hipaa/for-professionals/privacy/index.html.

physical or mental health or condition of an individual; the provision of health care to an individual; or the past, present, or future payment for the provision of health care to an individual"; and (3) either (a) "identifies the individual" or (b) "[w]ith respect to which there is a reasonable basis to believe the information can be used to identify the individual." 45 C.F.R. § 160.103.

88. Under the HIPAA de-identification rule, "health information is not individually identifiable only if": (1) an expert "determines that the risk is very small that the information could be used, alone or in combination with other reasonably available information, by an anticipated recipient to identify an individual who is a subject of the information" and "documents the methods and results of the analysis that justify such determination'"; or (2)(i) "the following identifiers of the individual or of relatives, employers, or household members of the individual are removed:

> A. Names;
> ***
> H. Medical record numbers;
> ***
> J. Account numbers;
> ***
> M. Device identifiers and serial numbers;
> N. Web Universal Resource Locators (URLs);
> O. Internet Protocol (IP) address numbers; … and
> R. Any other unique identifying number, characteristic, or code…; and
>
> (ii) the covered entity must not "have actual knowledge that the information could be used alone or in combination with other information to identify an individual who is a subject of the information."

45 C.F.R. § 164.514.

89. In a Health and Human Services' Health Information Privacy Bulletin ("HHS Privacy Bulletin"), Health and Human Services ("HHS") confirmed that HIPAA's protections apply to regulated entities' use of tracking technologies on webpages, such as Delta Dental's use

of the Tracking Technologies on its Websites and related subpages.[8] Specifically, HHS explained that "Tracking technologies on a regulated entity's user-authenticated webpages generally have access to PHI. Such PHI may include, for example, an individual's IP address, medical record number, home or email addresses, dates of appointments, or other identifying information that the individual may provide when interacting with the webpage."[9]

90. The HIPAA Privacy Rule requires any "covered entity"—which includes health plans liked Delta Dental—to maintain appropriate safeguards to protect the privacy of protected health information and sets limits and conditions on the uses and disclosures that may be made of protected health information without authorization. 45 C.F.R. §§ 160.103, 164.502.

91. An individual or corporation violates the HIPAA Privacy Rule if it knowingly and in violation of 42 U.S.C. §§ 1320d-1320d-9 ("Part C"): "(1) uses or causes to be used a unique health identifier; [or] (2) obtains individually identifiable health information relating to an individual." The statute states that a "person … shall be considered to have obtained or disclosed individually identifiable health information in violation of [Part C] if the information is maintained by a covered entity … and the individual obtained or disclosed such information without authorization." 42 U.S.C. § 1320d-6.

92. The criminal and civil penalties imposed by 42 U.S.C. § 1320d-6 apply directly to Delta Dental when it is knowingly disclosing individually identifiable health information relating to an individual, as those terms are defined under HIPAA.

93. Violation of 42 U.S.C. § 1320d-6 is subject to criminal penalties. 42 U.S.C. § 1320d-6(b). There is a penalty enhancement where "the offense is committed with intent to sell,

---

[8] *Use of Online Tracking Technologies by HIPAA Covered Entities and Business Associates*, U.S. Dept' of Health & Human Services, https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/hipaa-online-tracking/index.html ("HHS Privacy Bulletin").
[9] *Id.*

transfer, or use individually identifiable health information for commercial advantage, personal gain, or malicious harm." In such cases, the entity that knowingly obtains individually identifiable health information relating to an individual shall "be fined not more than $250,000, imprisoned not more than 10 years, or both."

**i. *Plan member status is among the health information protected by HIPAA***

94. An individual's status as a plan member is protected by HIPAA.

95. In Guidance regarding Methods for De-identification of Protected Health Information in Accordance with the Health Insurance Portability and Accountability Act Privacy Rule, the Department instructs:

> Identifying information alone, such as personal names, residential addresses, or phone numbers, would not necessarily be designated as PHI. For instance, if such information was reported as part of a publicly accessible data source, such as a phone book, then this information would not be PHI because it is not related to health data… If such information was listed with health condition, health care provision, or payment data, such as an indication that the individual was treated at a certain clinic, then this Information would be PHI.[10]

96. In its guidance for Marketing, the Department further instructs:

> The HIPAA Privacy Rule gives individuals important controls over whether and how their protected health information is used and disclosed for marketing purposes. With limited exceptions, the Rule requires an individual's written authorization before a use or disclosure of his or her protected health information can be made for marketing. … Simply put, a covered entity may not sell protected health information to a business associate or any other third party for that party's own purposes. Moreover, *covered entities may not sell lists of patients or enrollees to third parties* without obtaining authorization from each person on the list. (Emphasis added).[11]

97. The instructions continue:

---

[10] https://www.hhs.gov/sites/default/files/ocr/privacy/hipaa/understanding/coveredentities/De-identification/hhs_deid_guidance.pdf (last visited Aug. 28, 2024).

[11] https://www.hhs.gov/sites/default/files/ocr/privacy/hipaa/understanding/coveredentities/marketing.pdf (last visited Aug. 28, 2024).

> For example, it is "marketing" when: . . . A health plan sells a list of its members to a company that sells blood glucose monitors, which intends to send the plan's members brochures on the benefits of purchasing and using the monitors.

98. HHS has instructed for decades that patient status – identical to plan member status – is protected by the HIPAA Privacy Rule:

a) "The sale of a patient list to a marketing firm" is not permitted under HIPAA. 65 Fed. Reg. 82717 (Dec. 28, 2000);

b) "A covered entity must have the individual's prior written authorization to use or disclose protected health information for marketing communications," which includes disclosure of mere status with the covered entity, 67 Fed. Reg. 53186 (Aug. 14, 2002), such a patient or plan member list;

c) It would be a HIPAA violation "if a covered entity impermissibly disclosed a list of patient names, addresses, and hospital identification numbers." 78 Fed. Reg. 5642 (Jan. 25, 2013).

**ii. *There is no HIPAA exception for marketing on the Internet.***

100. HHS issued a bulletin in December 2022 (the "Bulletin") "to highlight the obligations" of covered entities, such as health plans, and their business associates under the HIPAA Privacy Rule "when using online tracking technologies," such as "Google Analytics," which "collect and analyze information about how internet users are interacting with a regulated entity's website or mobile application."[12]

101. In the Bulletin, HHS reminded covered entities that HIPAA applies to covered entities', including health plans', use of tracking technologies like the Tracking Technologies at

[12] HHS.gov, *HHS Office of Civil Rights Issue Bulletin on Requirements under HIPAA for Online Tracking Technologies to Protect the Privacy and Security of Health Information*, https://www.hhs.gov/about/news/2022/12/01/hhs-office-for-civil-rights-issues-bulletin-on-requirements-under-hipaa-for-online-tracking-technologies.html.

issue here. Among other things, HHS explained that covered entities, such as health plans, violate HIPAA when they use tracking technologies that disclose an individual's identifying information (like an IP address) even if no treatment information is included and even if the individual does not have a relationship with the health care provider:

> *How do the HIPAA Rules apply to regulated entities' use of tracking technologies?*
>
> Some regulated entities may be disclosing a variety of information to tracking technology vendors through tracking technologies placed on the regulated entity's website or mobile app, such as information that the individual types or selects when they use regulated entities' websites or mobile apps. The information disclosed might include an individual's medical record number, home or email address, or dates of appointments, as well as an individual's IP address or geographic location, device IDs, or any unique identifying code. In some cases, the information disclosed may meet the definition of individually identifiable health information (IIHI), which is a necessary pre-condition for information to meet the definition of PHI when it is transmitted or maintained by a regulated entity.
>
> IIHI collected on a regulated entity's website or mobile app generally is PHI, even if the individual does not have an existing relationship with the regulated entity and even if the IIHI, such as in some circumstances IP address or geographic location, does not include specific treatment or billing information like dates and types of health care services. But the mere fact that an online tracking technology connects the IP address of a user's device (or other identifying information) with a visit to a webpage addressing specific health conditions or listing health care providers is not a sufficient combination of information to constitute IIHI if the visit to the webpage is not related to an individual's past, present, or future health, health care, or payment for health care.[13]

102. Tracking technology vendors like the Tracking Technology Vendors here are considered business associates under HIPAA if they provide services to Delta Dental and receive or maintain PHI, as they do:

> Furthermore, tracking technology vendors are business associates if they create, receive, maintain, or transmit PHI on behalf of a regulated entity for a covered function (e.g. health care operations) or provide certain services to or for a covered entity (or another business associate) that involve the disclosure of PHI. In these circumstances, regulated entities must ensure that the disclosures made to such vendors are permitted by the Privacy Rule and enter into a business associate

[13] HHS.gov, *Use of Online Tracking Technologies by HIPAA Covered Entities and Business Associates*, https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/hipaa-online-tracking/index.html. (emphasis added)/

> agreement (BAA) with these tracking technology vendors to ensure that PHI is protected in accordance with the HIPAA Rules. For example, if an individual makes an appointment through the website of a covered health clinic for health services and that website uses third party tracking technologies, then the website might automatically transmit information regarding the appointment and the individual's IP address to a tracking technology vendor. In this case, the tracking technology vendor is a business associate and a BAA is required.[14]

103. HHS explained that tracking technologies on covered entities' patient portals "generally have access to PHI" and may access diagnosis and treatment information, in addition to other sensitive data:

> Tracking on user-authenticated webpages
>
> Regulated entities may have user-authenticated webpages, which require a user to log in before they are able to access the webpage, such as a patient or health plan beneficiary portal or a telehealth platform. ***Tracking technologies on a regulated entity's user-authenticated webpages generally have access to PHI***. Such PHI may include, for example, an individual's IP address, medical record number, home or email addresses, dates of appointments, or other identifying information that the individual may provide when interacting with the webpage. ***Tracking technologies within user-authenticated webpages may even have access to an individual's diagnosis and treatment information, prescription information, billing information, or other information within the portal***. Therefore, a regulated entity must configure any user-authenticated webpages that include tracking technologies to allow such technologies to only use and disclose PHI in compliance with the HIPAA Privacy Rule and must ensure that the electronic protected health information (ePHI) collected through its website is protected and secured in accordance with the HIPAA Security Rule.[15]

104. No PHI may be disclosed to tracking technology vendors like the Tracking Technology Vendors here unless Delta Dental has properly notified its website users and entered into a business associate agreement with the vendor:

> Regulated entities may identify the use of tracking technologies in their website or mobile app's privacy policy, notice, or terms and conditions of use. However, the Privacy Rule does not permit disclosures of PHI to a tracking technology vendor based solely on a regulated entity informing individuals in its privacy policy, notice, or terms and conditions of use that it plans to make such disclosures. Regulated

---

[14] *Id.*

[15] HHS.gov, *Use of Online Tracking Technologies by HIPAA Covered Entities and Business Associates*, https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/hipaa-online-tracking/index.html. (emphases added.)

> entities must ensure that all tracking technology vendors have signed a BAA and that there is an applicable permission prior to a disclosure of PHI.
>
> If there is not an applicable Privacy Rule permission or if the vendor is not a business associate of the regulated entity, then the individuals' HIPAA-compliant authorizations are required before the PHI is disclosed to the vendor. Website banners that ask users to accept or reject a website's use of tracking technologies, such as cookies, do not constitute a valid HIPAA authorization.
>
> Further, it is insufficient for a tracking technology vendor to agree to remove PHI from the information it receives or de-identify the PHI before the vendor saves the information. Any disclosure of PHI to the vendor without individuals' authorizations requires the vendor to have a signed BAA in place and requires that there is an applicable Privacy Rule permission for disclosure.[16]

105. Upon information and belief, Delta Dental does not have a BAA with the Tracking Technology Vendors.

**F. *Plaintiff's & Class Members' Expectation of Privacy.***

99. At all times when Plaintiff and Class Members provided their PII and PHI to Defendant, they each had a reasonable expectation that the information would remain private, and that Defendant would not share the Private Information with third parties for a commercial purpose unrelated to patient care.

**G. *Internet Cookies Are Personally Identifiable***

100. In the early years of the Internet, advertising on websites followed the same model as traditional newspapers. Just as a sporting goods store would choose to advertise in the sports section of a traditional newspaper, advertisers on the early Internet paid for ads to be placed on specific web pages based on the type of content displayed on the web page.

101. Computer programmers eventually developed "cookies"—small text files that web servers can place on a person's web browser and computing device when that person's web browser interacts with the website server. Cookies can perform different functions, like saving a

[16] *Id.*

user's login or other site settings. Eventually, some cookies were designed to acquire and record an individual Internet user's communications and activities on websites across the Internet.

102. Cookies are designed to and, in fact, most often do operate as a means of identification for Internet users.

103. Cookies are protected personal identifiers under HIPAA. *See* 45 C.F.R. § 164.514(b)(2)(i)(H), (J), (M), (N), and (R).

104. In general, cookies are categorized by (1) duration and (2) party.

105. There are two types of cookies classified by duration:

a. "Session cookies" are placed on a user's computing device only while the user is navigating the website that placed and accesses the cookie. The user's web browser typically deletes session cookies when the user closes the browser.

b. "Persistent cookies" are designed to survive beyond a single Internet-browsing session. The party creating the persistent cookie determines its lifespan. As a result, a persistent cookie can acquire and record a user's Internet communications for years and over dozens or hundreds of websites. Persistent cookies are sometimes called "tracking cookies."

106. Defendant improperly disclosed cookies along with Private Information, including cookies that contained the Google Client ID.

**H. *IP Addresses are Personally Identifiable Information.***

107. In addition to patient status, address, treatment, providers, and patient's unique Gmail session ID, Defendant improperly disclosed plan members' computer IP addresses to the Tracking Technology Vendors through the use of the Tracking Technologies.

108. An IP address is a number that identifies the address of a device connected to the Internet.

109. IP addresses are used to identify and route communications on the Internet.

110. IP addresses of individual Internet users are used by Internet service providers, Websites, and third-party tracking companies to facilitate and track Internet communications.

111. Google also tracks IP addresses associated with Internet users.

112. Google and other Tracking Technology Vendors track IP addresses for use of tracking and targeting individual homes and their occupants with advertising by using IP addresses.

113. Under HIPAA, an IP address is considered personally identifiable information:

a. HIPAA defines personally identifiable information to include "any unique identifying number, characteristic or code" and specifically lists the example of IP addresses. *See* 45 C.F.R. § 164.514 (2).

b. HIPAA further declares information as personally identifiable where the covered entity has "actual knowledge that the information could be used alone or in combination with other information to identify an individual who is a subject of the information." 45 C.F.R. § 164.514(2)(ii); *See also* 45 C.F.R. § 164.514(b)(2)(i)(O).

114. Even though an IP address could be connected to several members of the same household, it is still considered PHI. That is true, *even when the individual does not have an existing relationship with the regulated healthcare entity* since when the covered entity collects this information through its website or mobile app, it relates to the healthcare the individual has received or will receive.[17]

115. Consequently, Defendant's disclosure of plan members' IP addresses violated HIPAA and industry privacy standards.

---

[17] *See* HHS.gov, USE OF ONLINE TRACKING TECHNOLOGIES BY HIPAA COVERED ENTITIES AND BUSINESS ASSOCIATES, https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/hipaaonline-tracking/index.html (last visited Aug. 28, 2024).

### I. *Defendant Was Unjustly Enriched from the Use of The Tracking Technologies.*

116. The sole purpose of the use of the Tracking Technologies on Defendant's Website was marketing and profits.

117. In exchange for disclosing the personally identifiable information of its plan members, Defendant is compensated by the Tracking Technology Vendors in the form of enhanced advertising services and more cost-efficient marketing on Google and other marketing platforms.

118. Upon information and belief, Defendant was advertising its services on Google, and the Google Tracking Technologies were used to help Defendant market on Google's platforms.

119. Retargeting is a form of online marketing that targets users with ads based on their previous Internet communications and interactions.

120. Upon information and belief, Defendant re-targeted plan members and potential plan members to get more plan members to use its services.

121. By utilizing the Tracking Technologies, the cost of advertising and retargeting was reduced, thereby benefitting Defendant.

### J. *Plaintiff's and Class members' Private Information has economic value.*

122. Defendant and the Tracking Technology Vendors that Defendant uses profit from their use of Plaintiff's and Class member's personal data to target them with advertising and for other economic benefits, such as improving their internal operations.

123. The value of personal data is well understood and generally accepted as a form of currency. The robust market for Internet user data has been analogized to the "oil" of the tech industry.[18] A 2015 article from TechCrunch accurately noted that "Data has become a strategic

---

[18] https://www.economist.com/leaders/2017/05/06/the-worlds-most-valuable-resource-is-no-longer-oil-but-data

asset that allows companies to acquire or maintain a competitive edge."[19] That article noted that the value of a single Internet user—or really, a single user's data—varied from about $15 to more than $40.

124. The Organization for Economic Cooperation and Development ("OECD") has published numerous volumes discussing how to value data such as that which is the subject matter of this Complaint, including as early as 2013, with its publication "Exploring the Economic of Personal Data: A Survey of Methodologies for Measuring Monetary Value."[20] The OECD recognizes that data is a key competitive input not only in the digital economy but in all markets: "Big data now represents a core economic asset that can create significant competitive advantage for firms and drive innovation and growth."[21]

125. In *The Age of Surveillance Capitalism*, Harvard Business School Professor Shoshanna Zuboff notes that large corporations like Verizon, AT&T and Comcast have transformed their business models from fee for services provided to customers to monetizing their user's data—including user data that is not necessary for product or service use, which she refers to as "behavioral surplus."[22] In essence, Professor Zuboff explains that revenue from Internet user data pervades every economic transaction in the modern economy. It is a fundamental assumption of these revenues that there is a market for this data.

126. Professor Paul M. Schwartz noted in the *Harvard Law Review*:

> Personal information is an important currency in the new millennium. The monetary value of personal data is large and still growing, and corporate America is moving quickly to profit from the trend. Companies view this information as a

---

[19] https://techcrunch.com/2015/10/13/whats-the-value-of-your-data/

[20] *Exploring the Economics of Personal Data: A Survey of Methodologies for Measuring Monetary Value*, OECD DIGITAL ECONOMY PAPERS, No. 220 (Apr. 2, 2013), https://www.oecdilibrary.org/docserver/5k486qtxldmq-en.pdf

[21] https://www.oecd-ilibrary.org/industry-and-services/supporting-investment-in-knowledge-capital-growth-and-innovation_9789264193307-en

[22] Shoshanna Zuboff, THE AGE OF SURVEILLANCE CAPITALISM 166 (2019).

> corporate asset and have invested heavily in software that facilitates the collection of consumer information.[23]

127. Likewise, in *The Wall Street Journal*, former fellow at the Open Society Institute (and current principal technologist at the ACLU) Christopher Soghoian noted:

> The dirty secret of the Web is that the "free" content and services that consumers enjoy come with a hidden price: their own private data. Many of the major online advertising companies are not interested in the data that we knowingly and willingly share. Instead, these parasitic firms covertly track our web-browsing activities, search behavior and geolocation information. Once collected, this mountain of data is analyzed to build digital dossiers on millions of consumers, in some cases identifying us by name, gender, age as well as the medical conditions and political issues we have researched online. Although we now regularly trade our most private information for access to social-networking sites and free content, the terms of this exchange were never clearly communicated to consumers.[24]

128. As Professors Acquisti, Taylor, and Wagman relayed in their 2016 article "The Economics of Privacy," published in the *Journal of Economic Literature*: "Such vast amounts of collected data have obvious and substantial economic value. Individuals' traits and attributes (such as a person's age, address, gender, income, preferences, and reservation prices, but also her clickthroughs, comments posted online, photos uploaded to social media, and so forth) are increasingly regarded as business assets that can be used to target services or offers, provide relevant advertising, or be traded with other parties."[25]

129. The cash value of the personal user information unlawfully collected by Defendant provided during the Class Period can be quantified. For example, in a study authored by Tim

---

[23] Paul M. Schwartz, *Property, Privacy and Personal Data*, 117 HARV. L. REV. 2055, 2056–57 (2004).
[24] Julia Angwin, *How Much Should People Worry About the Loss of Online Privacy?*, THE WALL STREET JOURNAL (Nov. 15, 2011).
[25] Alessandro Acquisti, Curtis Taylor, and Liad Wagman, *The Economics of Privacy*, 54 J. of Econ. Literature 2, at 444 (June 2016), https://www.heinz.cmu.edu/~acquisti/papers/AcquistiTaylorWagman-JEL-2016.pdf

Morey, researchers studied the value that 180 internet users placed on keeping personal data secure.[26] Web browsing histories were valued at $52.00 per year.




130. Similarly, the value of user-correlated internet browsing history can be quantified, because Google Inc. was willing to pay users for similar information. Google had a panel called "Google Screenwise Trends" which, according to the internet giant, is designed "to learn more about how everyday people use the Internet." Upon becoming a panelist, internet users would add a browser extension that shares with Google the sites they visit and how they use them. The panelists consented to Google tracking such information for three months in exchange for one of a number of "gifts," including gift cards to retailers such as Barnes & Noble, Walmart, and Overstock.com. After three months, Google also agreed to pay panelists additional gift cards "for staying with" the panel. These gift cards, mostly valued at exactly $5, demonstrated that internet

---

[26] Tim Morey, *What's Your Personal Data Worth?*, DESIGN MIND (Jan. 18, 2011), https://web.archive.org/web/20131206000037/http://designmind.frogdesign.com/blog/what039syour-personal-data-worth.html.

industry participants understood the enormous value in internet users' browsing habits. Google pays Screenwise panelists up to $3 per week to be tracked.

131. User-correlated URLs have monetary value. They also have non-monetary, privacy value. For example, in a study by the Pew Research Center, 93% of Americans said it was "important" for them to be "in control of who can get information" about them. Seventy-four percent said it was "very important." Eighty-seven percent of Americans said it was "important" for them not to have someone watch or listen to them without their permission. Sixty-seven percent said it was "very important." And 90% of Americans said it was "important" that they be able to "control[] what information is collected about [them]." Sixty-five percent said it was very important.

132. Likewise, in a 2011 Harris Poll study, 76% of Americans agreed that "online companies . . . control too much of our personal information and know too much about our browsing habits."

133. A number of platforms have appeared where consumers can and do directly monetize their own data, and prevent tech companies from targeting them absent their express consent:

a. Brave's web browser, for example, will pay users to watch online targeted ads, while blocking out everything else.[27]

b. Loginhood states that it "lets individuals earn rewards for their data and provides website owners with privacy tools for site visitors to control their

[27] Get Paid to Watch Ads in the Brave Web Browser, at: https://lifehacker.com/get-paid-to-watch-ads-in-the-brave-web-browser-1834332279#:~:text=Brave%2C%20a%20chromium-based%20web%20browser%20that%20boasts%20an (Lifehacker, April 26, 2019) ("The model is entirely opt-in, meaning that ads will be disable by default. The ads you view will be converted into Brave's cryptocurrency, Basic Attention Tokens (BAT), paid out to your Brave wallet monthly").

data sharing," via a "consent manager" that blocks ads and tracking on browsers as a plugin.28

c. Ex-presidential candidate Andrew Yang's "Data Dividend Project" aims to help consumers, "[t]ake control of your personal data. If companies are profiting from it, you should get paid for it."29

d. Killi is a new data exchange platform that allows you to own and earn from your data.30

e. Similarly, BIGtoken "is a platform to own and earn from your data. You can use the BIGtoken application to manage your digital data and identity and earn rewards when your data is purchased."31

f. The Nielsen Company, famous for tracking the behavior of television viewers' habits, has extended their reach to computers and mobile devices through Nielsen Computer and Mobile Panel. By installing the application on your computer, phone, tablet, e-reader, or other mobile device, Nielsen tracks your activity, enters you into sweepstakes with monetary benefits, and earn points worth up to $50 per month.32

---

[28] https://loginhood.io/. *See also* https://loginhood.io/product/chrome-extension ("[s]tart earning rewards for sharing data – and block others that have been spying on you. Win-win.").

[29] How Does It Work, at: https://www.datadividendproject.com/ ("Get Your Data Dividend…We'll send you $$$ as we negotiate with companies to compensate you for using your personal data.").

[30] https://killi.io/earn/.

[31] https://bigtoken.com/faq#general_0 ("Third-party applications and sites access BIGtoken to learn more about their consumers and earn revenue from data sales made through their platforms. Our BIG promise: all data acquisition is secure and transparent, with consumers made fully aware of how their data is used and who has access to it.").

[32] Kevin Mercandante, *Ten Apps for Selling Your Data for Cash, Best Wallet Hacks* (June 10, 2020), https://wallethacks.com/apps-for-selling-your-data/.

134. Technology companies recognize the monetary value of users' sensitive, personal information, insofar as they encourage users to install applications explicitly for the purpose of selling that information to technology companies in exchange for monetary benefits.[33]

**REPRESENTATIVE PLAINTIFF'S EXPERIENCE**

135. As a condition of using Defendant's services, Plaintiff Cavallaro-Kearins disclosed her Private Information to Defendant as recently in March 2023. Plaintiff Cavallaro-Kearins logged into Defendant's web portal from her Chrome browser on her Android mobile device and was authenticated as a plan member and accessed Defendant's Website to search for a dentist in her network located near her. Plaintiff Cavallaro-Kearins input her city and plan network as a search parameter on Defendant's Website, and thereafter, evaluated particular dentists as providers on dentist-specific pages.

136. Plaintiff Cavallaro-Kearins reasonably expected that her communications with Defendant via the Website were confidential, solely between herself and Defendant, and that such communications would not be transmitted to or intercepted by a third party.

137. Plaintiff Cavallaro-Kearins provided her Private Information to Defendant and trusted that the information would be safeguarded according to Defendant's policies and state and federal law.

---

[33] Kari Paul, *Google launches app that will pay users for their dat*a, The Guardian (June 11, 2019), https://www.theguardian.com/technology/2019/jun/11/facebook-user-data-app-privacystudy; Saheli Roy Choudhury and Ryan Browne, *Facebook pays teens to install an app that could collect all kinds of data*, CNBC (Jan. 30, 2019), https://www.cnbc.com/2019/01/29/facebook-paying-users-to-install-app-to-collect-datatechcrunch.html; Jay Peters, *Facebook will now pay you for your voice recordings*, The Verge (Feb. 20, 2020), https://www.theverge.com/2020/2/20/21145584/facebook-pay-record-voicespeech-recognition-viewpoints-prounounciations-app.

138. As described herein, Defendant worked along with the Tracking Technology Vendors to intercept Plaintiff Cavallaro-Kearins's communications, including those that contained Private and confidential information.

139. Defendant willfully facilitated these interceptions without Plaintiff Cavallaro-Kearins's knowledge, consent or express written authorization.

140. Defendant transmitted to the Tracking Technology Vendors Plaintiff Cavallaro-Kearins's computer IP address, user-agent data, timestamp, city, insurance network, her status as a Defendant plan member, her communication with Defendant that she was searching for a dentist in her insurance network in her city, and the type of dentist she was searching for.

141. In addition, Defendant transmitted to Google Plaintiff Cavallaro-Kearins's Google Client ID.

142. Plaintiff Cavallaro-Kearins did not consent or otherwise provide express written authorization to Defendant to transmit to the Tracking Technology Vendors her Private Information.

143. By doing so without her consent, Defendant breached Plaintiff Cavallaro-Kearins's right to privacy and unlawfully disclosed Plaintiff Cavallaro-Kearins's Private Information.

144. Plaintiff Cavallaro-Kearins suffered injuries and damages in, *inter alia*, the form of (i) invasion of privacy; (ii) violation of confidentiality of her Private Information; (iii) loss of benefit of the bargain; (iv) loss of value of the Private Information; (v) violation of her legal rights and statutory damages; and (vi) the continued and ongoing risk to her Private Information.

145. Plaintiff Cavallaro-Kearins has dental insurance through Delta Dental provided by her employer. Plaintiff Cavallaro-Kearins has a continuing interest in ensuring that her Private Information is protected and safeguarded from future unauthorized disclosure. Plaintiff Cavallaro-Kearins anticipates needing to use the Website to search for in-network dentists in the future.

## TOLLING

146. Any applicable statute of limitations has been tolled by the "delayed discovery" rule. Plaintiff did not know (and had no way of knowing) that her Private Information was intercepted and unlawfully disclosed because Defendant kept this information secret.

## CLASS ACTION ALLEGATIONS

147. Plaintiff brings this action on behalf of herself and on behalf of all other persons similarly situated pursuant to Rule 23(b)(2), 23(b)(3), and 23(c)(4) of the Federal Rules of Civil Procedure.

148. The New York Class that Plaintiff Cavallaro-Kearins seeks to represent is defined as follows:

> **All individuals residing in the State of New York whose Private Information was disclosed to a third party without authorization or consent through the Tracking Technologies on Defendant's Website.**

149. Excluded from the New York Class are Defendant, its agents, affiliates, parents, subsidiaries, any entity in which Defendant has a controlling interest, any Defendant officer or director, any successor or assign, and any Judge who adjudicates this case, including their staff and immediate family.

150. Plaintiff reserves the right to modify or amend the definition of the proposed New York Class before the Court determines whether certification is appropriate.

151. **Numerosity, Fed R. Civ. P. 23(a)(1)**. The Class members are so numerous that joinder of all members is impracticable. Upon information and belief, there are over a million individuals whose PII and PHI may have been improperly accessed by the Tracking Technology Vendors, and the Class is identifiable within Defendant's records. The majority of those class members are believed to be New York residents.

152. **Commonality & Predominance, Fed. R. Civ. P. 23(a)(2) and (b)(3)**. Questions of law and fact common to the New York Class exist and predominate over any questions affecting only individual Class Members. These include:

a. Whether and to what extent Defendant had a duty to protect the PII and PHI of Plaintiff and Class Members;

b. Whether Defendant had duties not to disclose the PII and PHI of Plaintiff and Class Members to unauthorized third parties;

c. Whether Defendant violated its HIPAA Notice of Privacy Practices by disclosing the PII and PHI of Plaintiff and Class Members to Adobe, Google, Data Dog, and Qualtrics, and/or additional third parties.

d. Whether Defendant adequately, promptly and accurately informed Plaintiff and Class Members that their PII and PHI would be disclosed to third parties;

e. Whether Defendant violated the law by failing to promptly notify Plaintiff and Class Members that their PII and PHI had been compromised;

f. Whether Defendant adequately addressed and fixed the practices which permitted the disclosure of patient PHI and PII;

g. Whether Defendant engaged in unfair, unlawful, or deceptive practices by failing to safeguard the PII and PHI of Plaintiff and Class Members;

h. Whether Defendant violated the consumer protection statutes invoked herein;

i. Whether Plaintiff and Class Members are entitled to actual, consequential, and/or nominal damages as a result of Defendant's wrongful conduct;

j. Whether Defendant knowingly made false representations in its HIPAA Notice of Privacy Practices;

k. Whether Defendant knowingly omitted material representations with respect to its HIPAA Notice of Privacy Practices; and

l. Whether Plaintiff and Class Members are entitled to injunctive relief to redress the imminent and currently ongoing harm faced as a result of the Defendant's disclosure of their PII and PHI.

153. **Typicality, Fed. R. Civ. P. 23(a)(3)**. Plaintiff's claims are typical of those of other Class Members because all had their Private Information compromised as a result of Defendant's use of the Tracking Technologies, due to Defendant's misfeasance.

154. **Adequacy, Fed. R. Civ. P. 23(a)(4)**. Plaintiff will fairly and adequately represent and protect the interests of the Class Members in that Plaintiff have no disabling conflicts of interest that would be antagonistic to those of the other Members of the Class. Plaintiff seeks no relief that is antagonistic or adverse to the Members of the Class and the infringement of the rights and the damages Plaintiff has suffered are typical of other Class Members. Plaintiff has also retained counsel experienced in complex class action litigation, and Plaintiff intend to prosecute this action vigorously.

155. **Superiority and Manageability, Fed. R. Civ. P. 23(b)(3)**. Class litigation is an appropriate method for fair and efficient adjudication of the claims involved. Class action treatment is superior to all other available methods for the fair and efficient adjudication of the controversy alleged herein; it will permit a large number of Class Members to prosecute their common claims in a single forum simultaneously, efficiently and without the unnecessary duplication of evidence, effort and expense that hundreds of individual actions would require. Class action treatment will permit the adjudication of relatively modest claims by certain Class

Members, who could not individually afford to litigate a complex claim against a defendant, like Delta Dental, with significant resources. Further, even for those Class Members who could afford to litigate such a claim, it would still be economically impractical and impose a burden on the courts.

156. **Policies Generally Applicable to the Class**. This class action is also appropriate for certification because Defendant has acted or refused to act on grounds generally applicable to the Class, thereby requiring the Court's imposition of uniform relief to ensure compatible standards of conduct toward the Class Members and making final injunctive relief appropriate with respect to the Class as a whole. Defendant's policies challenged herein apply to and affect Class Members uniformly and Plaintiff's challenge of these policies hinges on Defendant's conduct with respect to the Class as a whole, not on facts or law applicable only to Plaintiff.

157. The nature of this action and the nature of laws available to Plaintiff and Class Members make the use of the class action device a particularly efficient and appropriate procedure to afford relief to Plaintiff and Class Members for the wrongs alleged because Defendant would necessarily gain an unconscionable advantage since they would be able to exploit and overwhelm the limited resources of each individual Class Member with superior financial and legal resources; the costs of individual suits could unreasonably consume the amounts that would be recovered; proof of a common course of conduct to which Plaintiff was exposed is representative of that experienced by the Class and will establish the right of each Class Member to recover on the cause of action alleged; and individual actions would create a risk of inconsistent results and would be unnecessary and duplicative of this litigation.

158. The litigation of the claims brought herein is manageable. Defendant's uniform conduct, the consistent provisions of the relevant laws, and the ascertainable identities of Class

Members demonstrate that there would be no significant manageability problems with prosecuting this lawsuit as a class action.

159. **Ascertainability & Notice**. Membership in the Class can be determined by objective records maintained by Defendant and adequate notice can be given to Class Members directly using information maintained in Defendant's records.

160. **Class-wide Injunctive Relief, Fed. R. Civ. P. 23(b)(2)**. Unless a Class-wide injunction is issued, Defendant will continue in its failure to properly secure the Private Information of Class Members, Defendant may continue to refuse to provide proper notification to Class Members regarding the practices complained of herein, and Defendant may continue to act unlawfully as set forth in this Complaint as Defendant has acted or refused to act on grounds generally applicable to the Class and, accordingly, final injunctive or corresponding declaratory relief with regard to the Class Members as a whole is appropriate under Rule 23(b)(2) of the Federal Rules of Civil Procedure.

161. Likewise, particular issues under Rule 23(c)(4) are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein. Such particular issues include, but are not limited to:

a. Whether Defendant owed a legal duty to not disclose Plaintiff's and Class Members' Private Information;

b. Whether Defendant owed a legal duty to not disclose Plaintiff's and Class Members' Private Information with respect to Defendant's HIPAA Notice of Privacy Practices;

c. Whether Defendant breached a legal duty to Plaintiff and Class Members to exercise due care in collecting, storing, using, and safeguarding their Private Information;

d. Whether Defendant failed to comply with its own policies and applicable laws, regulations, and industry standards relating to data security;

e. Whether Defendant adequately and accurately informed Plaintiff and Class Members that their Private Information would be disclosed to third parties;

f. Whether Defendant failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information disclosed to third parties;

g. Whether Class Members are entitled to actual, consequential, and/or nominal damages, and/or injunctive relief as a result of Defendant's wrongful conduct.

**CLAIMS**

**COUNT I**

**BREACH OF CONTRACT**

**(On behalf of Plaintiff & the New York Class)**

162. Plaintiff and Class Members repeat and re-allege each and every allegation in the Complaint as if fully set forth herein.

163. Defendant required Plaintiff and Class Members to provide their Private Information, including names, location information, computer IP addresses, and other content submitted into Defendant's Website as a condition of their receiving health plan services.

164. As a condition of utilizing Defendant's digital platforms and receiving services from Defendant, Plaintiff and Class Members provided their Private Information and compensation for their health plan services.

165. In so doing, Plaintiff and Class Members entered into contracts with Defendant by which Defendant agreed to safeguard and protect such information, in its HIPAA Notice of Privacy Practices and elsewhere, to keep such information secure and confidential, and to timely and accurately notify Plaintiff and Class Members if their data had been breached and compromised or stolen.

166. Plaintiff and Class Members fully performed their obligations under the contract with Defendant.

167. Defendant's relevant HIPAA Notice of Privacy Practices and representations require it to take appropriate steps to safeguard the Private Information entrusted to it by the Plaintiff and Class Members.

168. Defendant breached these agreements, which directly and/or proximately caused Plaintiff and Class Members to suffer damages, including nominal damages.

169. Defendant breached the contracts it made with Plaintiff and Class Members by failing to safeguard and protect their Private Information, and by failing to provide timely and accurate notice to them that the Private Information was compromised as a result of the Defendant sharing the Private Information with third parties without proper authorization.

170. As a direct and proximate result of Defendant's above-described breach of contract, Plaintiff and Class Members have suffered (and will continue to suffer) the compromise and disclosure of their Private Information and identities.

171. As a direct and proximate result of Defendant's above-described breach of contract, Plaintiff and Class Members are entitled to recover actual, consequential, and nominal damages.

## COUNT II

## BREACH OF FIDUCIARY DUTY

## (On Behalf of Plaintiff & the New York Class)

172. Plaintiff and Class Members repeat and re-allege each and every allegation in the Complaint as if fully set forth herein.

173. A relationship existed between Plaintiff and Class Members on the one hand and Defendant on the other in which Plaintiff and Class Members put their trust in Defendant to protect the Private Information of Plaintiff and Class Members, and Defendant accepted that trust.

174. Defendant breached the fiduciary duty that it owed to Plaintiff and Class Members by failing to act with the utmost good faith, fairness, and honesty, failing to act with the highest and finest loyalty, and failing to protect, and intentionally disclosing, the Private Information of Plaintiff and Class Members.

175. Defendant's breach of fiduciary duty was a legal cause of damage to Plaintiff and Class Members.

176. But for Defendant's breach of fiduciary duty, the damage to Plaintiff and Class Members would not have occurred.

177. Defendant's breach of fiduciary duty contributed substantially to producing the damage to Plaintiff and Class Members.

178. As a direct and proximate result of Defendant's breach of fiduciary duty, Plaintiff and Class Members are entitled to and do demand actual, consequential, and nominal damages, injunctive relief, and all other relief allowed by law.

## COUNT III

## UNJUST ENRICHMENT

## (On behalf of Plaintiff & the New York Class)

179. Plaintiff and Class Members repeat and re-allege each and every allegation in the Complaint as if fully set forth herein.

180. Plaintiff asserts this claim in the alternative to their contractual claims.

181. Defendant benefitted from Plaintiff and Class Members and unjustly retained those benefits at their expense.

182. Plaintiff and Class Members conferred a benefit upon Defendant in the form of Private Information that Defendant collected from Plaintiff and Class Members, without authorization and proper compensation. Defendant consciously collected and used this information for its own gain, providing Defendant with economic, intangible, and other benefits, including substantial monetary compensation.

183. Defendant unjustly retained those benefits at the expense of Plaintiff and Class Members because Defendant's conduct damaged Plaintiff and Class Members, all without providing any commensurate compensation to Plaintiff and Class Members.

184. The benefits that Defendant derived from Plaintiff and Class Members was not offered by Plaintiff and Class Members gratuitously and rightly belongs to Plaintiff and Class Members.

185. It would be inequitable under unjust enrichment principles in New York and every other state for Defendant to be permitted to retain any of the profit or other benefits wrongly derived from the unfair and unconscionable methods, acts, and trade practices alleged in this Complaint.

186. Defendant should be compelled to disgorge into a common fund for the benefit of Plaintiff and Class Members all unlawful or inequitable proceeds that Defendant received, and such other relief as the Court may deem just and proper.

**COUNT IV**

**BREACH OF IMPLIED CONTRACT**

**(On behalf of Plaintiff & the New York Class)**

187. Plaintiff and Class Members repeat and re-allege each and every allegation in the Complaint as if fully set forth herein.

188. When Plaintiff and Class Members provided their user data to Defendant in exchange for services, they entered an implied contract pursuant to which Defendant agreed to safeguard and not disclose their Private Information without consent.

189. Plaintiff and Class Members accepted Defendant's offers and provided their Private Information to Defendant.

190. Plaintiff and Class Members would not have entrusted Defendant with their Private Information in the absence of an implied contract between them and Defendant obligating them not to disclose this Private Information without consent.

191. Defendant breached these implied contracts by disclosing Plaintiff's and Class Members' Private Information to a third party, *i.e.*, the Tracking Technology Vendors.

192. As a direct and proximate result of Defendant's breaches of these implied contracts, Plaintiff and Class Members sustained damages as alleged herein. Plaintiff and Class Members would not have used Defendant's services, or would have paid substantially for these services, had they known their Private Information would be disclosed.

193. Plaintiff and Class Members are entitled to compensatory and consequential damages because of Defendant's breach of implied contract.

**COUNT V**

**BREACH OF CONFIDENCE**

**(On behalf of Plaintiff & the New York Class)**

194. Plaintiff and Class Members repeat and re-allege each and every allegation in the Complaint as if fully set forth herein.

195. Health plans have a duty to their plan members to keep non-public medical information confidential.

196. Plaintiff and Class Members had reasonable expectations of privacy in their communications exchanged with Defendant, including communications exchanged on Defendant's Website, which were further buttressed by Defendant's express promises in its HIPAA Notice of Privacy Practices.

197. Contrary to its duties as a health plan and its express promises of confidentiality, Defendant installed the Tracking Technologies to disclose and to transmit to third parties Plaintiff's and Class Members' communications with Defendant including Private Information and the contents of such information.

198. These disclosures were made without Plaintiff's or other Class Members' knowledge, consent or authorization.

199. The third-party recipients included, but were not limited to, Adobe, Google, Datadog, and Qualtrics.

200. The harm arising from a breach of health plan-patient confidentiality includes erosion of the essential confidential relationship between the health plan and the patient.

201. As a direct and proximate cause of Defendant's unauthorized disclosures of patient personally identifiable, non-public medical information, and communications, Plaintiff and Class Members were damaged by Defendant's breach in that:

a. Sensitive and confidential information that Plaintiff and Class Members intended to remain private is no longer private;

b. Plaintiff and Class Members face ongoing harassment and embarrassment in the form of unwanted targeted advertisements;

c. Defendant eroded the essential confidential nature of the health plan-patient relationship;

d. Defendant took something of value from Plaintiff and Class Members and derived benefit therefrom without Plaintiff's and Class Members' knowledge or informed consent and without compensation for such data;

e. Plaintiff and Class Members did not get the full value of the health plan services for which they paid, which included Defendant's duty to maintain confidentiality;

f. Defendant's actions diminished the value of Plaintiff's and Class Members' Private Information; and

g. Defendant's actions violated the property rights Plaintiff and Class Members have in their Private Information.

**COUNT VI**

**BAILMENT**

**(On behalf of Plaintiff & the New York Class)**

202. Plaintiff and Class Members repeat and re-allege each and every allegation in the Complaint as if fully set forth herein.

203. Defendant acquired and was obligated to safeguard the Private Information of Plaintiff and Class Members.

204. Defendant accepted possession and took control of Plaintiff's and Class Members' Private Information under such circumstances that the law imposes an obligation to safeguard the property of another.

205. Specifically, a constructive bailment arises when a defendant, as is the case here, takes lawful possession of the property of another and has a duty to account for that property, without intending to appropriate it.

206. Constructive bailments do not require an express assumption of duties, and may arise from the bare fact of the thing coming into the actual possession and control of a person fortuitously, or by mistake as to the duty or ability of the recipient to effect the purpose contemplated by the absolute owner.

207. During the bailment, Defendant owed a duty to Plaintiff and Class Members to exercise reasonable care, diligence and prudence in protecting their Private Information.

208. Defendant breached its duty of care by failing to take appropriate measures to safeguard and protect Plaintiff's and Class Members' Private Information, resulting in the unlawful and unauthorized access to, disclosure and misuse of such Information by third parties such as the Tracking Technology Vendors.

209. Defendant further breached its duty to safeguard Plaintiff's and Class Members' Private Information by failing to notify them individually in a timely and accurate manner that their Private Information had been disclosed to third parties without Plaintiff's and Class Members' knowledge, consent or authorization.

210. As a direct and proximate result of Defendant's breach of duty, Plaintiff and Class Members have suffered compensable damages that were reasonably foreseeable to Defendant, including but not limited to, the damages set forth herein.

**COUNT VII**

**VIOLATION OF THE NEW YORK DECEPTIVE TRADE PRACTICES ACT**

**New York Gen. Bus. Law § 349, *et seq*.**

**(On Behalf of Plaintiff & the New York Class)**

211. Plaintiff and Class Members repeat and re-allege each and every allegation in the Complaint as if fully set forth herein.

212. By the acts and conduct alleged herein, Defendant committed unfair or deceptive acts and practices by:

a. promising to maintain the privacy and security of Plaintiff's and Class Members' protected health information as required by law;

b. installing the Tracking Technologies to operate as intended and transmit Plaintiff's and Class Members' Private Information without their authorization to the Tracking Technology Vendors;

c. failing to disclose or omitting material facts to Plaintiff and Class Members regarding the disclosure of their Private Information to the Tracking Technology Vendors;

d. failing to take proper action to ensure the Tracking Technologies were configured to prevent unlawful disclosure of Plaintiff's and Class Members' Private Information;

e. unlawfully disclosing Plaintiff's and Class Members' Private Information to the Tracking Technology Vendors.

213. These unfair acts and practices violated duties imposed by laws, including but not limited to, the Federal Trade Commission Act, HIPAA and NY GBL § 349.

214. Defendant's actions also constitute deceptive and unfair acts or practices because Defendant knew it failed to disclose to Plaintiff and Class Members that their healthcare related communications via the Website would be disclosed to the Tracking Technology Vendors.

215. Defendant's actions also constitute deceptive and unfair acts or practices because Defendant intended that Plaintiff and Class Members rely on its deceptive and unfair acts and

practices and the concealment and omission of material facts in connection with Defendant's offering of goods and services.

216. Specifically, Defendant was aware that Plaintiff and Class Members depended and relied upon it to keep their communications confidential, and Defendant instead disclosed that information to the Tracking Technology Vendors.

217. In addition, Defendant's material failure to disclose that Defendant collects Plaintiff's and Class Members' Private Information for marketing purposes with the Tracking Technology Vendors constitutes an unfair act or practice prohibited by the NY GBL § 349. Defendant's actions were immoral, unethical, and unscrupulous.

218. Plaintiff had reasonable expectations of privacy in their communications exchanged with Defendant, including communications exchanged at https://www1.deltadentalins.com/.

219. Plaintiff's reasonable expectations of privacy in the communications exchanged with Defendant were further buttressed by Defendant's express promises in its HIPAA Notice of Privacy Practices and Website Privacy and Security Policy.

220. Contrary to its duties as a health plan and its express promises of confidentiality, Defendant deployed the Tracking Technologies to disclose and transmit Plaintiff's personally identifiable, non-public medical information, and the contents of her communications exchanged with Defendant to third parties, *i.e.*, the Tracking Technology Vendors.

221. Defendant's disclosures of Plaintiff's and Class Members' Private Information were made without their knowledge, consent, or authorization, and were unprivileged.

222. The harm arising from a breach of provider-patient confidentiality includes erosion of the essential confidential relationship between the health plan and the patient.

223. Defendant willfully, knowingly, intentionally, and voluntarily engaged in the aforementioned acts when it incorporated the Tracking Technologies with knowledge of the Tracking Technologies' purpose and functionality.

224. The harm described herein could not have been avoided by Plaintiff and Class Members through the exercise of ordinary diligence.

225. As a result of Defendant's wrongful conduct, Plaintiff were injured in that they never would have provided their PII and PHI to Defendant, or purchased Defendant's services, had they known or been told that Defendant shared their confidential and sensitive Private Information with the Tracking Technology Vendors.

226. As a direct and proximate result of Defendant's multiple, separate violations of the NY GBL § 349, Plaintiff and Class Member have suffered harm, including financial losses related to the payments or services made to Defendant that Plaintiff and Class Members would not have made had they known of Defendant's disclosure of their PII and PHI to the Tracking Technology Vendors; lost control over the value of their PII and PHI; and other harm resulting from the unauthorized use or threat of unauthorized use of their PII and PHI, including for unwanted solicitations or marketing, entitling them to damages in an amount to be proven at trial.

227. Defendant's acts, practices and omissions were done in the course of Defendant's business of furnishing healthcare-related services to consumers in the State of New York.

228. Plaintiff bring this action on behalf of herself and Class Members for the relief requested above and for the public benefit to promote the public interests in the provision of truthful, fair information to allow consumers to make informed purchasing decisions and to protect Plaintiff, Class Members and the public from Defendant's unfair, deceptive and unlawful practices. Defendant's wrongful conduct as alleged in this Complaint has had widespread impact on the public at large.

229. As a result, Plaintiff and Class Members are entitled to damages in an amount to be determined at trial, along with their costs and attorneys' fees incurred in this action.

**COUNT VIII**

**VIOLATIONS OF ELECTRONIC COMMUNICATIONS PRIVACY ACT ("ECPA")**

**18 U.S.C. § 2511(1) *et seq.***

**UNAUTHORIZED INTERCEPTION, USE AND DISCLOSURE**

**(On Behalf of Plaintiff & the New York Class)**

230. Plaintiff and Class Members repeat and re-allege each and every allegation in the Complaint as if fully set forth herein.

231. The ECPA protects both sending and receipt of communications.

232. 18 U.S.C. § 2520(a) provides a private right of action to any person whose wire or electronic communications are intercepted, disclosed, or intentionally used in violation of Chapter 119.

233. The transmissions of Plaintiff's PII and PHI to Defendant's Website qualifies as a "communication" under the ECPA's definition of 18 U.S.C. § 2510(12).

234. Electronic Communications. The transmission of PII and PHI between Plaintiff and Class Members and Defendant's Website with which they chose to exchange communications are "transfer[s] of signs, signals, writing,…data, [and] intelligence of [some] nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic, or photooptical system that affects interstate commerce" and are therefore "electronic communications" within the meaning of 18 U.S.C. § 2510(2).

235. Content. The ECPA defines content, when used with respect to electronic communications, to "include [] any information concerning the substance, purport, or meaning of that communication." 18 U.S.C. § 2510(8).

236. Interception. The ECPA defines the interception as the "acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device" and "contents…include any information concerning the substance, purport, or meaning of that communication." 18 U.S.C. § 2510(4), (8).

237. Electronic, Mechanical, or Other Device. The ECPA defines "electronic, mechanical, or other device" as "any device…which can be used to intercept a[n]…electronic communication[.]" 18 U.S.C. § 2510(5). The following constitute "devices" within the meaning of 18 U.S.C. § 2510(5):

a. Plaintiff's and Class Members' browsers;

b. Plaintiff's and Class Members' computing devices (including mobile devices);

c. Defendant's web-servers;

d. Defendant's Website; and

e. The Tracking Technology codes deployed by Defendant to effectuate the sending and acquisition of patient communications.

238. By utilizing and embedding the Tracking Technologies on its Website, Defendant intentionally intercepted, endeavored to intercept, and procured another person to intercept, the electronic communications of Plaintiff and Class Members, in violation of 18 U.S.C. § 2511(1)(a).

239. Specifically, Defendant intercepted Plaintiff's and Class Members' electronic communications via the Tracking Technologies, which tracked, stored, and unlawfully disclosed Plaintiff's and Class Members' PII to the Tracking Technology Vendors.

240. Defendant's intercepted communications include, but are not limited to, communications to/from Plaintiff's and Class Members' regarding PII and PHI, such as treatment, location, and dentists.

241. By intentionally disclosing or endeavoring to disclose the electronic communications of Plaintiff and Class Members to affiliates and other third parties, while knowing or having reason to know that the information was obtained through the interception of an electronic communication in violation of 18 U.S.C. § 2511(1)(a), Defendant violated 18 U.S.C. § 2511(1)(c).

242. By intentionally using, or endeavoring to use, the contents of the electronic communications of Plaintiff and Class Members, while knowing or having reason to know that the information was obtained through the interception of an electronic communication in violation of 18 U.S.C. § 2511(1)(a), Defendant violated 18 U.S.C. § 2511(1)(d).

243. Unauthorized Purpose. Defendant intentionally intercepted the contents of Plaintiff's and Class Members' electronic communications for the purpose of committing a tortious act in violation of the Constitution or laws of the United States or of any State – namely, invasion of privacy, among others.

244. Defendant intentionally used the wire or electronic communications to increase its profit margins. Defendant specifically used the Tracking Technologies to track and utilize Plaintiff's and Class Members' PII and PHI for financial gain.

245. Defendant was not acting under color of law to intercept Plaintiff and Class Member's wire or electronic communication.

246. Plaintiff and Class Members did not authorize Defendant to acquire the content of their communications for purposes of invading Plaintiff's privacy via the Tracking Technologies tracking codes.

247. Any purported consent that Defendant received from Plaintiff and Class Members was not valid.

248. In sending and in acquiring the content of Plaintiff's and Class Members' communications relating to the browsing of Defendant's Website, Defendant's purpose was tortious, criminal, and designed to violate federal and state legal provisions, including as described above the following: (i) a knowing intrusion into a private, place, conversation, or matter that would be highly offensive to a reasonable person; and (ii) violation of NY GBL § 349.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Patricia Cavallaro-Kearins respectfully prays for judgment in her favor and against Defendant Delta Dental as follows:

A. For an Order certifying this action as a Class action and appointing Plaintiff as Class Representatives and Plaintiff's counsel as Class Counsel;

B. For equitable relief enjoining Defendant from engaging in the wrongful conduct complained of herein pertaining to the misuse and/or disclosure of Plaintiff's and Class Members' Private Information, and from refusing to issue prompt, complete and accurate disclosures to Plaintiff and Class Members;

C. For equitable relief compelling Defendant to utilize appropriate methods and policies with respect to consumer data collection, storage, and safety, and to disclose with specificity the type of PII and PHI disclosed to third parties;

D. For equitable relief requiring restitution and disgorgement of the revenues wrongfully retained as a result of Defendant's wrongful conduct;

E. For an award of nominal damages, actual damages, compensatory damages, statutory damages, and statutory penalties, in an amount to be determined, as allowable by law;

F. For an award of punitive damages, as allowable by law;

G. For an award of attorneys' fees and costs, and any other expense, including expert witness fees;

H. Pre- and post-judgment interest on any amounts awarded; and

I. Such other and further relief as this Honorable Court may deem just and proper.

**DEMAND FOR JURY TRIAL**

Plaintiff Patricia Cavallaro-Kearins hereby demands that this matter be tried to a jury.

Dated: February 3, 2025

DWOSKIN WASDIN LLP

*s/ Eric S. Dwoskin*

Eric S. Dwoskin
433 Plaza Real, Suite 275
Boca Raton, FL 33432
Tel.: (561) 849-8060
edwoskin@dwowas.com

*Attorney for Plaintiff and the putative Class*